UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| **JOEL HUSK,** | ] |
| | ] |
| **Plaintiff,** | ] |
| | ] |
| v. | ] Case No.: 1:17-cv-01433-ACA |
| | ] |
| **CITY OF TALLADEGA, ALABAMA,** | ] |
| | ] |
| **Defendant.** | ] |

## MEMORANDUM OPINION

The City of Talladega Police Department fired Plaintiff Joel Husk after he violated Department policy by posting racially insensitive material on his personal Facebook account. Mr. Husk, proceeding *pro se*, filed this lawsuit against the City of Talladega ("Talladega") alleging that Talladega treated him differently than another employee who violated the same policy but was not fired. He brings his claims pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and 42 U.S.C. § 1981.

Currently before the court is Talladega's motion for summary judgment. (Doc. 18). The court entered an order directing Mr. Husk to file his response in opposition on or before October 25, 2018. (Doc. 21). The court instructed Mr. Husk that his response to the motion must conform to the requirements set forth under Federal Rule of Civil Procedure 56 and advised him of the possible

consequences if he failed to adequately respond. (*Id.* at 1–2). Finally, a copy of Rule 56 along with instructions regarding the preparation and submission of briefs and evidentiary materials was attached to the order. (*Id.* at 3–12). Despite this clear instruction, Mr. Husk has failed to file a response to Talladega's motion for summary judgment.

Though Mr. Husk failed to oppose Talladega's motion, the court "cannot base the entry of summary judgment on the mere fact that the motion [is] unopposed but, rather, must consider the merits of the motion." *United States v. One Piece of Real Property Located at 5800 SW 74th Ave., Miami*, 363 F.3d 1099, 1101 (11th Cir. 2004) (citing *Dunlap v. Transamerica Occidental Life Ins. Co.*, 858 F.2d 629, 632 (11th Cir. 1988)). This is because, even when a motion for summary judgment is not opposed, "the movant is not 'absolved of the burden of showing that it is entitled to judgment as a matter of law.'" *Reese v. Herbert*, 527 F.3d 1253, 1268–69 (11th Cir. 2008).

In evaluating whether an unopposed summary judgment motion should be granted, the court is not required to perform a "*sua sponte* review of all the evidentiary materials on file," but must only "ensure that the motion itself is supported by evidentiary materials." *One Piece*, 363 F.3d at 1101–02. Therefore,

the court's review of the record is limited to "the materials submitted by [Talladega] in support of its motion." *Reese*, 527 F.3d at 1269 n.26.

Upon review of the motion and supporting evidentiary materials, and for the reasons explained below, the court **WILL GRANT** summary judgment in favor of Talladega.

**I.     BACKGROUND**

The court views the evidence in the light most favorable to the nonmoving party. *Baas v. Fewless*, 886 F.3d 1088, 1091 (11th Cir. 2018). The Talladega Police Department ("TPD") is a subdivision of the City of Talladega, Alabama. (Doc. 8 at 6; Doc. 21-1 at 4–5; Doc. 20-3 at 2). Mr. Husk, a Caucasian male, began working as a TPD police officer in July 2014. (Doc. 20-1 at 4–5; Doc. 8 at 2). Throughout his employment, Mr. Husk actively maintained a personal Facebook page. (Doc. 20-1 at 7). On his Facebook page, Mr. Husk posted photographs wearing his TPD uniform and was Facebook friends with several city employees. (*Id.* at 12–13, 15; Doc. 20-3 at 2–3).

The use of social media by a Talladega police officer is governed by the City's Policy and Procedures Manual, which Mr. Husk received on the day he was hired. (*See* Doc. 20-1 at 16). The "Code of Conduct and Social Media Policy," requires officers to "adhere to conduct that does not reflect negatively on the Police

Department, its members, or members of other agencies or the City of Talladega." (Doc. 20-3 at 3–4). The Manual defines conduct unbecoming of a sworn officer as "that which brings the department into disrepute or reflects discredit on the sworn officer as a member of the department, or that which impairs the operation or efficiency of the department or its officers." (*Id.*).

In the fall of 2016, Talladega became aware that one of its police officers shared a racially insensitive post on Facebook. Talladega referred the matter to the City Manager, who is authorized to discipline, suspend, or terminate city employees. (*Id.* at 2, 5–6). The City Manager determined that Mr. Harris, a TPD police officer of Native American ancestry, shared a post on his own Facebook page that included a photograph of fallen soldiers lying on a battlefield with the words, "Over 620,000 white people died to free black slaves and still to this day not even 1 thank you." (Doc. 20-1 at 57; Doc. 20-4 at 3–4, 9). The City Manager immediately scheduled a pre-disciplinary meeting with Mr. Harris. (Doc. 20-3 at 5–6). During the meeting, Mr. Harris apologized for sharing the material and agreed to remove the post from his Facebook page within the hour. (*Id.* at 5; Doc. 20-4 at 5). The City Manager punished Mr. Harris for this violation with a six-day suspension without pay. (Doc. 20-3 at 5). The City Manager later testified that he did not know Mr. Harris was of Native American ancestry. (*Id.* at 6).

A couple of months later, Mr. Husk shared on his own Facebook page the same racially insensitive post previously circulated by Mr. Harris. (*Id.* at 5, 8, 9). He also shared the following posts:

- A photograph of Barack Obama next to a photograph of a Black Lives Matter protest with the words, "Was Dallas a terrorist attack? Yes! Carried out by Obama's own homegrown terrorist group!" (Doc. 20-1 at 56).

- A photograph of Klansmen carrying a Confederate flag next to a photograph of a Black Lives Matter protest with the words, "The KKK is a hate group right? Isn't it about time we start being honest in America . . . and admit that #blacklivesmatter is also a hate group?" (*Id.* at 55).

- A photograph of Melania Trump with the words, "Fluent in Slovenia, English, French, Serbian, and German," next to a photograph of Michelle Obama with the words, "Fluent in Ghetto." (*Id.* at 57).

One of Mr. Husk's Facebook friends saw these posts, took screenshots of the posts, and shared them publicly with others in the community. (Doc. 20-2 at 1–3). Later, TPD was "tagged" in these shared Facebook posts and identified as Mr. Husk's employer. (*Id.* at 3).

On November 15, 2016, the City Manager Office received a call from a newspaper reporter asking about "multiple racially insensitive posts that were shared on Facebook by Talladega Police Officer Joel Husk." (Doc. 20-3 at 2). The City Manager investigated the matter and discovered that Angela Vincent, a Talladega resident, compiled and reposted Mr. Husk's four posts. (*Id.* at 3, 8; Doc 20-2 at 2–3). On Ms. Vincent's post, she questioned how people "feel about someone that's sworn to serve and protect all people posting this" and encouraged others to "share and repost." (Doc. 20-2 at 5). People responded to Ms. Vincent's post by encouraging others to call and complain to Talladega. (*Id.* at 8).

Later that same day, the City Manager held a pre-disciplinary meeting with Mr. Husk to discuss the racially offensive material. (Doc. 20-3 at 4; Doc. 20-1 at 60). The City Manager informed Mr. Husk that his conduct "would not be tolerated by [Talladega], as it negatively impact[ed] the community's perception of [TPD] and potentially corrupt[ed] his ability to properly carry out the duties of his position." (Doc. 20-3 at 4). Mr. Husk responded by disputing that the posts were racially insensitive and claiming that he was unaware "sharing posts (rather than creating the original posts) was inappropriate behavior." (*Id.*; Doc. 20-1 at 19). Unlike Mr. Harris, Mr. Husk did not remove the posts from his Facebook page. (Doc. 20-1 at 18).

After the meeting, Mr. Husk returned to his regularly scheduled shift. (*Id.* at 19). The City Manager reviewed the Department's Policy and Procedures Manual and determined that Mr. Husk's conduct was in direct violation of the Code of Conduct and Social Media Policy. (Doc. 20-3 at 4–5). The following day, Mr. Husk received a "Notice of Disciplinary Action" outlining the City Manager's findings and informing Mr. Husk of the City Manager's decision to terminate his employment. (Doc. 20-1 at 60).

After exhausting the TPD's internal appeals process, Mr. Husk filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging claims of race discrimination related to his termination. (*Id.* at 60–66; Doc. 8 at 6). Six months later, Mr. Husk filed this lawsuit alleging that he was disparately disciplined and ultimately terminated because of his race. (Doc. 1 at 1).

## II. ANALYSIS

In the amended complaint, Mr. Husk asserts two counts of race discrimination in violation of Title VII (Count I) and 42 U.S.C. § 1981 (Count II). (*Id.* at 1). Talladega contends it is entitled to judgment as a matter of law on both claims because Mr. Husk is unable to establish a *prima facie* case of race discrimination. (Doc. 19 at 13). "The court shall grant summary judgment if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

   A. *Title VII Race Discrimination Claim*

Title VII makes it illegal for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e–2(a)(1). Where, as here, a plaintiff seeks to establish discrimination through circumstantial evidence, the court applies the burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004).

Under this framework, Mr. Husk bears the initial burden of making a *prima facie* case of discrimination by showing by a preponderance of the evidence that: (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he was discharged from that position; and (4) in terminating his employment, the City of Talladega treated him less favorably than a similarly situated individual outside of his protected class. *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1325 (11th Cir. 2011). If Mr. Husk makes this showing, he raises a presumption that his race motivated the Talladega Police Department to treat him

unfavorably. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). The burden then shifts to Talladega to articulate a legitimate, non-discriminatory reason for terminating Mr. Husk's employment. *Id.* at 254–55. If Talladega sustains its burden, Mr. Husk must prove that the proffered non-discriminatory reason is really a pretext for unlawful discrimination. *Id.* at 255–56.

Mr. Husk's amended complaint alleges that he was disciplined differently than Mr. Harris because Mr. Husk is Caucasian and Mr. Harris is Native American. (Doc. 8 at 3 ¶ 14). Talladega argues that Mr. Husk cannot establish the fourth element of his *prima facie* case because the conduct Mr. Harris engaged in was not similar in all material respects to Mr. Husk's conduct. (Doc. 19 at 14). Talladega further argues that Mr. Husk is unable to prove that its legitimate, non-discriminatory reason for terminating Mr. Husk's employment was a pretext for discrimination. (*Id.* at 17). The court will first address whether there is sufficient evidence to establish a *prima facie* case, followed by whether there is sufficient evidence to establish pretext.

To establish a *prima facie* case, plaintiffs in employment discrimination cases must prove, among other things, that they received treatment less favorable than similarly situated employees outside of their protected class. *McDonnell Douglas*, 411 U.S. at 802. The Eleventh Circuit emphasized this point in its recent

decision *Lewis v. City of Union City, Georgia*, 918 F.3d 1213 (11th Cir. 2019). In *Lewis*, the Court clarified that a plaintiff proceeding under the *McDonnell Douglas* framework must show that his alleged comparators are "similarly situated in all material respects." *Id.* at 1224. The Eleventh Circuit went on to point out that, in most cases, adequate comparators are those who have been "engaged in the same basic conduct (or misconduct), . . . subject to the same employment policy, guideline, or rules, . . . under the jurisdiction of the same supervisor, . . . and [] share the [same] employment or disciplinary history" as the plaintiff. *Id.* at 1227–28.

Talladega argues that Mr. Harris is not an adequate comparator because his misconduct was materially different than Mr. Husk's. Talladega makes a good point. Mr. Husk and Mr. Harris did not engage in misconduct that was similar: Mr. Harris shared one racially insensitive post and Mr. Husk shared four. And the officers responded differently during their respective pre-disciplinary meetings. While Mr. Harris expressed remorse for using poor judgment in sharing the post and took it upon himself to remove it, Mr. Husk objected to the City Manager characterizing the posts as racially insensitive and argued that the Policy applied only to creating, not sharing, posts. (Doc. 20-3 at 4–6).

But even if the court assumes Mr. Husk's conduct was similar in all material respects to Mr. Harris's conduct, so that Mr. Harris qualifies as a comparator and Mr. Husk could make out a *prima facie* case of discrimination, he is unable to rebut Talladega's legitimate, non-discriminatory reasons for terminating Mr. Husk. Talladega articulated three different reasons for terminating Mr. Husk: (1) Mr. Husk shared multiple racially insensitive Facebook posts in violation of the department's Code of Conduct and Social Media Policy; (2) Mr. Husk never removed the posts, allowing them to remain on his Facebook page throughout the course of all disciplinary and appeal hearings; and (3) the public's "overwhelmingly negative" reaction to Mr. Husk's posts, which compromised the Department's trustworthiness and effectiveness." (Doc. 19 at 18). Each of these stated reasons are legitimate, nondiscriminatory justifications for terminating Mr. Husk's employment. Therefore, the burden shifts back to Mr. Husk to provide evidence that all of these stated reasons are nothing more than a pretext for race discrimination.

"[T]o avoid summary judgment [the plaintiff] must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination." *Clark v. Coats & Clark, Inc.,* 990 F.2d 1217, 1228 (11th Cir. 1993) (citation omitted). A reason is not pretext for discrimination "unless it is

shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515 (1993). Where, as here, "the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it. Quarreling with that reason is not sufficient." *Wilson,* 376 F.3d at 1088 (citation omitted).

Given the court's assumption that Mr. Husk established a *prima facie* case of discrimination, a reasonable jury *could* find the first reason proffered by Talladega was pretext for discrimination. However, Mr. Husk is required to rebut *all* of Talladega's proffered legitimate, nondiscriminatory reasons for firing him. *Chapman v. AI Transport*, 229 F.3d 1012, 1025 (11th Cir. 2000). Nothing in the record establishes that Talladega's other reasons for terminating Mr. Husk—that he never removed the posts and the "overwhelmingly negative" public reaction—were false and that discrimination was the real reason for Mr. Husk's termination. Indeed, Mr. Husk agreed during his deposition that "a bad perception of a police department by the community has an adverse effect on [the Department's] ability to [perform its] public safety work." (Doc. 20-1 at 34). Without any facts or argument suggesting that two of Talladega's stated reason were pretextual, Mr. Husk has failed to carry his burden under the *McDonnell Douglas* framework of "creat[ing] a triable issue concerning [his] employer's discriminatory intent."

*Smith*, 644 F.3d at 1328. Therefore, the court **WILL GRANT** summary judgment on Mr. Husk's Title VII claim in favor of Talladega.

### B. *§ 1981 Does Not Confer a Private Right of Action Against State Actors*

In the amended complaint, Mr. Husk alleges his claims of race discrimination under 42 U.S.C. § 1981 and Title VII as if they were synonymous. The City of Talladega, however, is a state actor, and "[s]ection 1981 does not provide a cause of action against state actors; instead, claims against state actors or allegations of § 1981 violations must be brought pursuant to 42 U.S.C. § 1983." *Baker v. Birmingham Bd. of Educ.*, 531 F.3d 1336, 1337 (11th Cir. 2008). But this court has a duty to construe *pro se* complaints liberally. *Tannenbaum v. United States*, 148 F.3d 1262, 1263 (11th Cir. 1998). And, the Supreme Court has explained that plaintiffs need not "invoke § 1983 expressly in order to state a claim." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 10–11 (2014). Accordingly, the court construes Mr. Husk's complaint to assert his § 1981 discrimination claim through § 1983.

This liberal construction does not save his claim. The Eleventh Circuit "has routinely and systematically grouped Title VII and § 1981 claims for analytic purposes." *Jimenez v. Wellstar Health Sys.*, 596 F.3d 1304, 1312 (11th Cir. 2010); *see also Standard v. A.B.E.L. Servs.,* 161 F.3d 1318, 1330 (11th Cir. 1998) ("Both

of these statutes have the same requirements of proof and use the same analytical framework, therefore we shall explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well."). Thus, because Mr. Husk's Title VII claim fails, so does his § 1981 claim. The court **WILL GRANT** Talladega's motion for summary judgment on Mr. Husk's § 1981 discrimination claim.

### III. CONCLUSION

For the reasons stated above, the court **WILL GRANT** Talladega's motion for summary judgment and **WILL ENTER** judgment in Talladega's favor. The court will enter a separate order consistent with this memorandum opinion.

**DONE** and **ORDERED** this June 24, 2019.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE